THE PEOPLE OF THE STATE OF NEW YORK ex rel. H. JAECKEL & SONS, INC., Relator, *v.* JOHN F. GILCHRIST and Others, Constituting the State Tax Commission of the State of New York, Respondents.

Third Department, May 8, 1924.

Taxation — corporation income tax — certiorari to review assessment made under Tax Law, art. 9-A — salary paid to president consisted of balance left after paying other salaries and preferred dividends — president worked about one day per week and received $40,000 for fourteen months — dividends were never declared on common stock — conclusion of Tax Commission that $28,000 should be deducted from president's salary on ground of diversion of profits sustained.

The conclusion of the Tax Commission in assessing franchise tax based on net income under article 9-A of the Tax Law, that $28,000 should be deducted from the salary of $40,000 of the president of the corporation for the fourteen months covered by the report is sustained, since it appears that the corporation, which is a family affair, is controlled by the president and his sons; that no dividends have ever been paid on the common stock; that the president's salary apparently was fixed by paying him a stipulated amount and the balance left from the net income after the other salaries and the preferred dividends were paid; and that the president, an aged man, devoted about one day per week to the business. Under the circumstances outlined, the president's salary was not measured by the ordinary and reasonable value of his services as required by the statute, and the payment thereof amounted to a diversion of the profits under the guise of a salary.

CERTIORARI issued out of the Supreme Court (after taking effect of the Civil Practice Act)* and attested on the 18th day of August, 1922, directed to John F. Gilchrist and others, constituting the State Tax Commission of the State of New York, commanding them to certify and return to the office of the clerk of the county of Albany all and singular their proceedings had in assessing a franchise tax upon the relator under article 9-A of the Tax Law for the tax year beginning November 1, 1922, based upon its income for the year ending December 31, 1921, and for the two months' period ending February 28, 1922, relator having changed its year from a calendar to a fiscal year basis. (See Tax Law, art. 9-A, added by Laws of 1917, chap. 726, as amd. by Laws of 1919, chap. 628; Laws of 1920, chap. 640; Laws of 1921, chap. 705, and Laws of 1922, chap. 507.)

*Chadbourne, Hunt, Jaeckel & Brown* [*Russell D. Burchard* of counsel], for the relator.

*Carl Sherman, Attorney-General* [*H. P. Kehoe* and *C. T. Dawes, Deputies Attorney-General,* of counsel], for the respondents.

HINMAN, J.:

This is a certiorari to review a determination of the State Tax Commission assessing a franchise tax upon the relator under article 9-A of the Tax Law based upon income received during a period of fourteen months beginning January 1, 1921, and ending February 28, 1922. The period was lengthened by two months due to a change of fiscal year to one beginning March first. The period covered is the same as that reported to the Federal government. Section 214 of the Tax Law (added by Laws of 1917, chap. 726, as amd. by Laws of 1920, chap. 640; Laws of 1921, chap. 705, and Laws of 1922, chap. 507) makes the return to the Federal government subject " to any correction thereof for fraud, evasion or error, as ascertained by the State Tax Commission." Under section 209 of the Tax Law (added by Laws of 1917, chap. 726, as amd. by Laws of 1920, chap. 640), the entire net income subject to tax in the State is " presumably " the same as the entire net income as reported to the Federal government. The Court of Appeals has said in *People ex rel. Barcalo Mfg. Co.* v. *Knapp* (227 N. Y. 64, 71): " While the basis for the computation of the Commission is the returned net income under the Federal statutes, the Commission is free to fix, from the return and any other information, the true and correct amount of the net income." The Federal statute provides that in determining net income of a corporation there may be deducted from gross income " all the ordinary and nec-

---

* See Civ. Prac. Act, § 1283, as amd. by Laws of 1922, chap. 355.— [REP.

**122** People ex rel. Jaeckel & Sons, Inc., *v.* Gilchrist.

Third Department, May, 1924. [Vol. 209

essary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services *actually* rendered," etc. (Federal Revenue Act of 1921 [42 U. S. Stat. at Large, 254], § 234, subd. a, ¶ 1.) In construing a similar provision in the Payne-Aldrich Tariff Act of 1909 (36 U. S. Stat. at Large, 112, § 38), which is also known as the Federal Corporation Excise Tax Act of 1909, the Circuit Court of Appeals, Third Circuit, in *United States* v. *Philadelphia Knitting Mills Co.* (273 Fed. Rep. 657), held that the government was justified in refusing to deduct a $20,000 salary of the president of the company, where he was an elderly man and the salary was unreasonable with reference to the services rendered. The court said: " It [the government] has a right, therefore, to attack the action of a board of directors and show by evidence, not that a given salary is too much, but that, in the circumstances, the whole or some part of it is not salary at all but is profits diverted to a stockholding officer under the guise of salary and as such is subject to taxation." In fact the relator takes no issue with the State Tax Commission as to this being the law and concedes that the State Tax Commission has a right to inquire into the action of a board of directors to determine whether an officer's salary is in part a diversion of profits and as such is subject to taxation. The question here is whether there has been a diversion of profits under the guise of salary. For the fourteen months' period covered by this return the president of the company was credited with a salary of substantially $40,000, from which the State Tax Commission has eliminated the sum of $28,000, allowing substantially $12,000 salary for that period.

Hugo Jaeckel, the president of the company, established a business for the manufacture and sale of fur garments in 1861. He established a thriving business and as his sons grew up, three of them went into the business with him and became experts in the various lines of the business. By reason of his advancing years and in order to perpetuate the business, a corporation was formed in 1916 with place of business in New York city and with a large factory at White Plains. The father was made president of the company. Hugo F. Jaeckel, Jr., was made a vice-president with entire charge of the manufacturing end of the business and he was given the management of the finances. Another son, Richard Jaeckel, was made vice-president and was given general supervision of sales. Another son, Walter Jaeckel, was made treasurer and he was placed in charge of the purchase of raw material. Another son, who was practicing law and not engaged in the business, was made secretary at a small salary. The father and these four

sons held all of the common stock, more than a majority of which was held by the father and only one share was held by the son who was secretary. The father and these four sons were made the directors of the company and have since continued to act as such. First preferred stock to the value of $50,000 was issued, which is now held in trust for Mrs. Hugo Jaeckel, presumably the wife of the president. Second preferred stock was issued to the value of $390,000, all of which is held by members of the Jaeckel family, and the president of the company owns $156,000 worth of this issue. Dividends at seven per cent have been paid on both of these preferred issues of stock. No dividends up to the present time have been paid on the common stock. A very large volume of business has been done during the entire period since incorporation and very large salaries have been paid to the father and the sons actively engaged in the business, indicating that the business has been most profitable. There is no record to show what salaries they received prior to incorporating in 1916, but the relator claims that since that time it has been the practice of the board of directors to fix a salary at the beginning of the year, which was treated as a drawing account, and at the end of the year additional compensation was provided in such amounts as the directors should determine according to the success of the business and the value of their services to the company. For the year 1921, covered by the return herein, the salary of Vice-President Hugo F. Jaeckel, Jr., was fixed in advance at $17,500. At the end of the year he was allowed $7,500 making $25,000. In March, 1922, his salary for the year 1922 was fixed at $25,000, effective as of January 1, 1922. For the two months of 1922 represented in the accounting period here involved, he was allowed compensation at the rate of $25,000 a year and in the return his salary for the fourteen months was figured at $29,166. Vice-President Richard Jaeckel's salary for 1921 was fixed in advance at $15,000. He was allowed at the end of the year $7,500, making $22,500, and his total compensation for the fourteen months was figured at $26,500. The salary of Walter Jaeckel, the treasurer of the company, was fixed in similar manner, the total amount allowed him for the fourteen months' period being $23,333. Another son, Albert Jaeckel, was not actively engaged in the business and received a small salary as secretary. As stated by one of the witnesses, the father and the three sons actively engaged in the business received what amounted to drawing accounts and which were termed " fixed salaries " with the understanding that at the end of the year, if the business justified it, they should receive at least as much as they were worth to the corporation.

**124** People ex rel. Jaeckel & Sons, Inc., *v.* Gilchrist.

Third Department, May, 1924. [Vol. 209

Hugo Jaeckel, the president of the company, was seventy-five years of age in June, 1923, and gave approximately one day a week to the business of the company. The testimony with reference to his present participation in the affairs of the company is as follows: " The business requires the attention of a chief executive, Mr. Hugo Jaeckel, who, in addition to giving a part of his time to the business, lends his personal credit wherever necessary, and does a considerable amount of general supervision and directing of the policy of the business." No facts are shown to prove the value of his services. In the return involved here his compensation for the fourteen months has been fixed at $39,666, which is said to represent a salary of $35,000 for the year 1921 and two months' salary in 1922 at the rate of a reduced salary of $28,000. The entire net income given by the company for the fourteen months' period was $43,917.50. The amount deducted for salaries was $127,833, of which about $118,000 was for the father and his three sons who were actively engaged in the business. This $118,000 represents a distribution in salaries to executives alone of six per cent on the gross volume of business done. At the hearing witnesses for the relator were asked for the names of some of their competitors and it is the claim of the respondents that the records of two of these compet tors on file in the office of the Commission show that one of them did a business of $1,500,000, and spent for salaries of executives $50,000, showing a percentage of gross volume of business devoted to salaries of three and one-half per cent, and another of these competitors did a business of $3,250,000 with executive salaries of $72,000, showing a percentage of two and one-half per cent of gross volume of business devoted to salaries. The reports of these competitors are not in the record except a summary of them as represented in a letter from the Commission to the Attorney-General. No objection, however, has been raised as to the sufficiency of the return in this respect and no effort was made to have the letter of the Commission excluded from the return unless the reports of these competitors were included in the return for the purpose of testing the accuracy of the letter of the Commission. I, therefore, see no objection to accepting the letter of the Commission as evidence of the facts therein contained. Comparison of these facts with the facts reported by the relator lead the Commission to conclude, in the light of all other circumstances, that the amount of salaries deducted by the relator was excessive and evasive and so far as the salary of the president was concerned did not represent merely ordinary and necessary expenses for services actually rendered.

The Commission seems to have reached a correct result. One of

the sons was the acting general manager and had entire charge of the manufacturing and finances and had been with the business for twenty-seven years. He received about $100 a day for his services while the president worked about one day a week and received about $600 a day. The salary which the Commission has allowed as a proper deduction for the president was about $12,000 for the sixty days of work in the fourteen months, which would give him about $200 a day. The business, therefore, had a competent general manager and each department was managed by a son who was expert in his particular line. It may well be that the sons were not overpaid and the Commission has so found. One of them had been recently offered $50,000 a year in another house and another of them had been offered $30,000 a year with additional compensation. It may well be that one of the reasons for giving them additional compensation at the end of the year was to recognize the value of their services which would not have been accomplished by simply declaring a dividend on the common stock held by the father and his sons. A dividend would have given them $17,000 each out of the $118,000 distributed to all of them as salaries. Such a dividend would have given the father $66,500 instead of $39,666. But the amount of money which the father would have received and did receive is not the important consideration. It was the manner in which it was received, whether for services or in lieu of a dividend for the purpose of evading taxation. We must assume as the Commission did that the sons were worth to the business about $25,000 a year each and were not overpaid. That does not prove the value of the father's services to be $35,000 a year. It tends to prove the contrary. Between them the sons covered every field of the business, purchasing, manufacturing and selling. Under these circumstances what was left for the father to do, a man seventy-five years of age with three such sons to run the business? It is quite apparent that he had practically retired. He went there about once a week. It is said that he had general supervision and that at times he loaned his credit. This general assertion, unsupported by facts illustrating what this may have amounted to, does not seem to me to overcome the fair inference to be drawn from the whole case, that each year the board had determined how much the sons were worth and the balance of what they felt could be distributed was given to the father. It was not measured by the ordinary and reasonable value of his services as required by the statute. A dividend was conveniently avoided by fixing a salary for him far disproportionate to the value of any services which he could reasonably be expected to render to such a well-established

business which was apparently well in hand under the expert guidance in each department of a son who had been brought up in the business and had been with him many years, one of them for twenty-seven years. His compensation was called salary, but I think it was in large part profits diverted to the controlling stockholder under the guise of salary and that as such it could not be considered as a whole as a deductible ordinary and necessary expense for services actually rendered. I think the Commission was quite liberal with him in fixing his compensat on at about $200 a day, and I cannot see any reasonable ground for annulling the decision of the Commission involving the elimination of $28,000 from the amount deducted for his sa ary. The Commission has made a strong *prima facie* case justifying its conclusion that $28,000 should be eliminated from his salary on the ground that it was not shown to be an ordinary and necessary expense for services actually rendered. The circumstances indicate that there was evasion. The relator has failed to explain or to justify the sa ary sought to be paid to the president by any facts proving that his services to the company were actually worth the amount claimed to have been paid to him as such. It is most plausible to conclude that a close corporation such as this, where its stockholders were the officers of the company receiving the salaries and were the directors empowered to fix the salaries, would be likely to distribute their surp us profits in such a way as to avoid this tax by inflating a salary instead of declaring a dividend. That they did so is evidenced by the fact that during the whole life of the corporation no dividend had been declared upon the common stock held by them.

The determination should be confirmed, with fifty dollars costs and disbursements.

Determination unanimously confirmed, with fifty dollars costs and disbursements.